1

2

3

4

5                               UNITED STATES DISTRICT COURT

6                              NORTHERN DISTRICT OF CALIFORNIA

7

8    KIMBERLY BENSON, *et al.*,                    No. C-09-5272 EMC

9              Plaintiffs,

10                                                 RELATED ACTION
          v.
11   JPMORGAN CHASE BANK, N.A.,                    No. C-09-5560 EMC

12             Defendant.

13   _____/         **ORDER GRANTING IN PART AND**
                                                   **DENYING IN PART DEFENDANT'S**
14   JOHN ALEXANDER LOWELL, *et al.*,              **MOTIONS TO DISMISS**

15             Plaintiffs,                         **(Docket No. 12 in C-09-5272)**
                                                   **(Docket No. 14 in C-09-5560)**
16        v.

17   JPMORGAN CHASE BANK, N.A.,

18             Defendant.

19   _____/

20        The Court has related the above-referenced cases.  In both putative class actions, Plaintiffs[1]

21   have filed suit against Defendant JPMorgan Chase Bank, N.A., individually and as a successor in

22   interest to Washington Mutual, Inc. ("WaMu").  According to the complaints, which are

23   substantially the same, WaMu and JPMorgan aided and abetted a Ponzi scheme.  Currently pending

24   before the Court are JPMorgan's motions to dismiss.

25   ///

26   ///

27   _____

28        [1] For convenience, the Court refers to the plaintiffs in the *Benson* case and the plaintiffs in the
     *Lowell* case as "Plaintiffs" collectively.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1     Having considered the parties' briefs and accompanying submissions, as well as oral

2     argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part JPMorgan's motions.

3                          **I.    FACTUAL & PROCEDURAL BACKGROUND**

4     As alleged in Plaintiff's complaints, three nonparties – William Wise, Jacqueline Hoegel,

5     and Kristi Hoegel – were responsible for setting up a Ponzi scheme wherein they offered for sale and

6     sold fraudulent certificates of deposit ("CDs") to Plaintiffs and other innocent investors.  This

7     scheme allegedly continued for several years but eventually met its end in March 2009, when the

8     Securities Exchange Commission ("SEC") commenced an action against Mr. Wise and his

9     associates based on the above-described course of conduct.  *See* Benson Compl. ¶ 75; Lowell

10    Compl. ¶ 52.

11    In the pending cases, Plaintiffs have not sued any of the direct participants in the Ponzi

12    scheme.  The federal court in Texas where the SEC action is pending has enjoined private actions

13    against those parties.  Instead, they have sued only JPMorgan, individually and as WaMu's

14    successor, on the theory that JPMorgan and WaMu knew of and facilitated the Ponzi scheme.

15    More specifically, Plaintiffs allege that Mr. Wise and his associates set up various Nevada

16    limited liability corporations ("Nevada LLCs") and then established WaMu accounts for those

17    companies.  Plaintiffs allege that WaMu/JPMorgan knew of the underlying Ponzi scheme.  As

18    evidence of that knowledge, Plaintiffs allege, *e.g.*, the bank knew from the face of investor checks

19    being deposited into the Nevada LLCs' accounts that investors thought they were buying CDs from

20    Mr. Wise, his associates, or the Nevada LLCs and, at the same time, also knew that neither Mr.

21    Wise, his associates, nor the Nevada LLCs were in fact registered to sell securities.  Plaintiffs also

22    allege that WaMu/JPMorgan knew that all of the investor deposits were being commingled in the

23    same accounts and that the investor funds were not being used to purchase any securities but rather

24    were being wired to offshore bank accounts in names other than the Nevada LLCs or were being

25    used to pay for Mr. Wise and his associates' personal expenses.  *See* Benson Compl. ¶¶ 55, 97;

26    Lowell Compl. ¶¶ 29, 71.  According to Plaintiffs, WaMu/JPMorgan's knowledge of the above came

27    in part from audits that the bank performed prior to the authorization and installation of two remote

28    banking systems for the Nevada LLCs, which enabled Mr. Wise and his associates to make wire

United States District Court

For the Northern District of California

1   transfers to offshore accounts from their offices and also permitted them to deposit investor checks

2   directly from their offices.  *See* Benson Compl. ¶¶ 8, 67, 73, 70; Lowell Compl. ¶¶ 45, 47, 60.  These

3   audits allegedly revealed to WaMu/JPMorgan, *inter alia*, the nature of the business conducted by the

4   Nevada LLCs, the industry served by the Nevada LLCs, the financial strength of the Nevada LLCs,

5   the ability of the Nevada LLCs to sell securities, the number of persons employed by the Nevada

6   LLCs, and the number and amount of account debits and credits per month for the Nevada LLCs'

7   bank accounts.  *See* Benson Compl. ¶ 70; Lowell Compl. ¶ 47.

8        Based on the above allegations, the plaintiffs in the *Benson* case have asserted claims for (1)

9   aiding and abetting fraud; (2) aiding and abetting conversion; (3) aiding and abetting breach of

10  fiduciary duty; (4) conspiracy to commit fraud and conversion; and (5) violation of California

11  Business & Professions Code § 17200 ("UCL").  *See* Benson Compl. ¶¶ 92-127.  Similarly, the

12  plaintiff in *Lowell* has alleged claims for (1) aiding and abetting fraud; (2) aiding and abetting

13  conversion; and (3) violation of § 17200.  *See* Lowell Compl. ¶¶ 66-88.

## II.   DISCUSSION

14

15  A.   Legal Standard

16       Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the

17  failure to state a claim for which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  In considering

18  such a motion, a court must take all well-pleaded allegations in the complaint as true and construe

19  them in the light most favorable to the nonmoving party.  *See Cousins v. Lockyer*, 568 F.3d 1063,

20  1067 (9th Cir. 2009).  While a complaint need not contain detailed factual allegations, legal

21  conclusions or broad allegations of ultimate facts are not sufficient.  The complaint must contain

22  enough facts to state a claim for relief that is plausible on its face.  *See id.* at 1067-68.

23            A claim has facial plausibility . . .  when the plaintiff pleads factual
             content that allows the court to draw the reasonable inference that the
24           defendant is liable for the misconduct alleged.  The plausibility
             standard is not akin to a probability requirement, but it asks for more
25           than a sheer possibility that a defendant has acted unlawfully.  Where
             a complaint pleads facts that are merely consistent with a defendant's
26           liability, it stops short of the line between possibility and plausibility
             of entitlement to relief.

27

28

1   *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks

2   omitted); *see generally Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*,

3   550 U.S. 544 (2007).  A determination of plausibility is "a context-specific task that requires the

4   reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950.

5   B.   <u>Aiding and Abetting</u>

6        As indicated above, Plaintiffs in both pending actions have asserted claims for aiding and

7   abetting certain torts (*e.g.*, fraud, conversion).  In California, the state courts have held that liability

8   for aiding and abetting depends on proof of two elements: (1) that the defendant had actual

9   knowledge of the specific primary wrong and that (2) the defendant substantially assisted it.  *See*

10  *Casey v. United States Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005).

11       JPMorgan's central argument for dismissing the aiding and abetting causes of action pertains

12  to the knowledge requirement.  *See* Benson Mot. at 4-8; Lowell Mot. at 4-7.  According to

13  JPMorgan, the aiding and abetting causes of action should be dismissed because Plaintiffs failed to

14  allege that Defendant had actual knowledge of the specific, primary wrongs allegedly committed by

15  Mr. Wise and his associates.  JPMorgan contends that Plaintiffs' allegations, at best, support the

16  notion that JPMorgan at most had some vague suspicions regarding Mr. Wise and his associates'

17  account activities.  Notwithstanding JPMorgan's argument, the Court finds that Plaintiffs have

18  sufficiently alleged that JPMorgan actually knew of the underlying Ponzi scheme.  *Casey* is

19  instructive.

20       In *Casey*, a bankruptcy trustee sued several banks for allegedly aiding and abetting a

21  fraudulent scheme to loot the debtor corporation, DFJ Italia.  *See* Casey, 127 Cal. App. 4th at 1141.

22  The trustee claimed that certain officers and directors of DFJ Italia perpetrated a money laundering

23  scheme to divert and loot investor funds from the corporation to sham, alter-ego companies

24  associated with the officers and directors.  *See id.* at 1142.  According to the trustee, the scheme

25  implicated the defendant banks because the banks aided and abetted the officers and directors by:

26           allowing them to open accounts with invalid tax identification
             numbers, which accounts were then used to drain funds from the

27           Estate to the accounts of individual directors, officers, their families
             and affiliated companies; allowing large sums of cash, often in excess

28           of $250,000 at a time and aggregating some $6 million, to be removed

4

United States District Court

For the Northern District of California

from [the banks'] cash vaults (in unmarked duffel bags); violating
banking regulations and the [banks'] own internal policies and
procedures; allowing obviously forged negotiable instruments to be
paid; and, ignoring monetary restrictions ('not to exceed' limits)
appearing on the face of individual checks by paying sums in excess of
such limits.

*Id.* In determining whether actual knowledge was adequately pleaded for aiding and abetting breach

of fiduciary duty, the *Casey* court explained that the complaint must allege that the defendant

possessed actual knowledge of the specific, primary violation. *See id.* at 1152. According to the

court, because the asserted breach of fiduciary duty stemmed from the alleged misappropriation of

corporate funds from the debtor corporation, the trustee was required to allege that the defendant

banks knew of the source of the funds deposited into the alter-ego accounts. *See id.* at 1149, 1152.

Because the trustee had failed to allege that the banks knew of the source of the funds deposited into

the alter-ego accounts, the banks could not have known that allowing the directors and officers to

withdraw funds from the accounts was assisting a diversion of corporate funds. *See id.* at 1152. In

short, the bank's knowledge of a critical fact was not alleged.

Unlike the trustee in *Casey*, Plaintiffs in the instant case have sufficiently alleged such

knowledge. Specifically, Plaintiffs allege that WaMu/JPMorgan knew that Mr. Wise and his

associates were perpetrating the Ponzi scheme, *i.e.*, the fraudulent sale of CDs to innocent investors,

whose funds were ultimately used by the Ponzi participants for their own personal benefit. *See*

Benson Compl. ¶ 97; Lowell Compl. ¶ 71. Plaintiffs support these allegations of knowledge with

more detailed factual allegations. For example, Plaintiffs allege that, as a result of the audits,

WaMu/JPMorgan knew that neither Mr. Wise, his associates, nor the Nevada LLCs were registered

to sell securities, that investors nonetheless believed that they were purchasing CDs from the Ponzi

participants, as reflected on the face of the checks being deposited into the accounts, and that all of

the investor deposits were being commingled in the same accounts. *See* Benson Compl. ¶¶ 55, 97;

Lowell Compl. ¶¶ 29, 71. Plaintiffs also contend that the audits revealed that none of the investor

funds were being used to purchase any securities but instead, were being wired to offshore bank

accounts or being used to pay for Mr. Wise and his associates' personal expenses. *See* Benson

Compl. ¶ 55; Lowell Compl. ¶ 29.

United States District Court

For the Northern District of California

1    The assertion that WaMu/JPMorgan had actual knowledge of the Ponzi scheme is supported

2    by additional allegations.  Plaintiffs have alleged that the bank maintained a close business

3    relationship with Mr. Wise and his associates and that considerable resources of the bank were

4    consumed in the management of the Nevada LLCs' accounts -- Mr. Wise and associates were

5    "amongst the largest accounts handled at the Napa branches."  Benson Compl. ¶ 97; Lowell Compl.

6    ¶ 71.  WaMu assigned at least two senior employees – a branch manager and a commercial banking

7    officer – to the task of monitoring and assisting in various banking transactions executed by Mr.

8    Wise and his associates over a four-year period.  *See* Benson Compl. ¶ 97; Lowell Compl. ¶ 71.

9    Specifically, these senior employees are alleged to have supervised and effectuated daily deposits,

10   withdrawals, and wire transfers of large sums of money on behalf of Mr. Wise and his associates.

11   *See* Benson Compl. ¶ 52; Lowell Compl. ¶ 34.  In fact, according to Plaintiffs, the amount of time

12   required to service these accounts was so significant that it prompted senior employees to

13   recommend the installation of a remote banking system.  *See* Benson Compl. ¶ 67; Lowell Compl. ¶

14   36.  The allegations that these transactions occurred at the local Napa branches and were overseen

15   by senior officers therein – as opposed to, *e.g.*, a large banking center, makes it reasonable to infer

16   that senior employees at the Napa branches personally knew about the nature of the accounts and

17   transactions and were thus aware of Mr. Wise's Ponzi scheme.  Therefore, given the specific

18   allegations and reasonable inference therefrom,  the Court finds that Plaintiffs have sufficiently pled

19   a plausible claim that WaMu/JPMorgan knew of the Ponzi scheme allegedly perpetrated by Mr.

20   Wise and his associates.

21   Likewise, Plaintiffs have adequately pled the second element of aiding and abetting – *i.e.*,

22   that the bank "substantially assisted" the Ponzi scheme.  In *Casey*, the state court held that "even

23   'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance

24   element . . . if the bank actually knew those transactions were assisting the customer in committing a

25   specific tort."  *Casey*, 127 Cal. App. 4th at 1145; *see also Henry v. Lehman Commer. Paper, Inc. (In

26   re First Alliance Mortg. Co.)*, 471 F.3d 977, 994-95 (9th Cir. 2006) (noting that, while the definition

27   of "substantial assistance" is not clear under California law, even "ordinary business transactions"

28   can constitute substantial assistance); *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101,

**United States District Court**
For the Northern District of California

1118 (C.D. Cal. 2003) (explaining that "substantial assistance" requires a defendant's actions to

have been a "substantial factor" in causing the plaintiff's injury).  Here, Plaintiffs have met the

substantial assistance requirement by detailing the critical actions taken by the bank to assist the

Ponzi participants – *e.g.*, allowing Mr. Wise and his associates to deposit investor monies into the

Nevada LLCs' accounts, permitting them to commingle funds within the Nevada LLCs' accounts,

allowing Mr. Wise and the Nevada LLCs to transfer large amounts of investment deposits to

offshore banking accounts, allowing Mr. Wise to use investor monies to pay for personal expenses,

and authorizing remote banking platforms that prevented oversight.  *See* Benson Compl. ¶ 98;

Lowell Compl. ¶ 72.  In addition, Plaintiffs have asserted that the assistance of the bank gave a false

sense of legitimacy to the illicit activities, which allowed Mr. Wise and his associates to defraud

Plaintiffs.  *See* Benson Compl. ¶ 99; Lowell Compl. ¶ 73.

As to causation and proximate cause, the sum of the allegations establish that

WaMu/JPMorgan's actions played a critical role in the facilitation of the Ponzi scheme.  As noted

above, JPMorgan provided essential banking services that allowed the Ponzi scheme to continue

over a period of time.  The fact that Mr. Wise had tried at least three other U.S. banks, all of which

declined his business apparently due to its suspicious nature, lends further support for the notion that

WaMu/JPMorgan's services played a critical part in the maintenance of the Ponzi scheme.  *See*

Benson Compl. ¶ 44.  Moreover, once WaMu/JPMorgan had actual knowledge of the Ponzi scheme,

WaMu/JPMorgan could reasonably foresee that its actions would have the effect of injuring

investors.  In sum, the Court finds Plaintiffs' allegations to be sufficient to state a plausible claim

that WaMu/JPMorgan substantially assisted the Ponzi scheme.

JPMorgan relies on the district court's dismissal in *Litson-Gruenberg v. JPMorgan Chase &*

*Co.*, No. 09-CV-056-0, 2009 U.S. Dist. LEXIS 117749 (N.D. Tex. Dec. 16, 2009), in arguing that

the instant cases should likewise be dismissed.  However, the complaints filed in the present action

are factually distinguishable from the complaint filed in *Litson-Gruenberg*.  In *Litson-Gruenberg*,

plaintiff investors sued WaMu/JPMorgan for allegedly aiding and abetting Mr. Wise and his

associates' breach of fiduciary duty and fraud.  *See Litson-Gruenberg*, 2009 U.S. Dist. LEXIS

117749 at *1-2; *see also* Liang Decl., Ex. C.  Specifically, the investors alleged that

United States District Court

For the Northern District of California

1  WaMu/JPMorgan had actual knowledge of the Ponzi scheme where the bank knew, *inter alia*, that

2  the individuals opening the bank accounts had a history of violating securities laws, that the account

3  was affiliated with an offshore bank, that investors were sending checks for the purpose of buying

4  CDs with high interest rates, and that in actuality, none of the account funds were being used to

5  purchase securities.  *See* Liang Decl., Ex. C.  The *Litson-Gruenberg* court dismissed the aiding and

6  abetting claims because the investors had failed to allege the bank had knowledge that the Ponzi

7  participants made false representations or stole funds based on those representations.  *See Litson-*

8  *Gruenberg*, 2009 U.S. Dist. LEXIS 117749, at *7-8.

9      Unlike *Litson-Gruenberg*, the complaints in the cases at bar contain factual allegations that

10  address the deficiencies in *Litson-Gruenberg*.  As stated above, Plaintiffs allege that

11  WaMu/JPMorgan knew, among other things, that Mr. Wise, his associates, and the Nevada

12  corporations were not registered to sell securities, that investors nonetheless erroneously believed

13  that they were purchasing CDs from the Ponzi participants, and that investor checks specifically

14  designated for CDs were actually being commingled in the Nevada LLCs' accounts and then wired

15  to offshore bank accounts or misappropriated for personal use.  *See* Benson Compl. ¶ 112; Lowell

16  Compl. ¶ 71.  Plaintiffs provide factual allegations to support their assertion of actual knowledge,

17  allegations absent in *Litson-Gruenberg.  See* Benson Compl. ¶¶ 70, 97; Lowell Compl. ¶¶ 47, 71.

18  Moreover, unlike *Litson-Gruenberg*, Plaintiffs allege that WaMu/JPMorgan knew about the Ponzi

19  scheme because of the close business relationship between WaMu/JPMorgan bank officers and the

20  Ponzi participants given the nature of the Napa branch office and its senior officers, as well as the

21  two separate audits conducted prior to installing the remote banking platforms.  *See* Benson Compl.

22  ¶ 70; Lowell Compl. ¶ 47.  In sum, the Court concludes that, while the *Litson-Gruenberg* plaintiffs

23  failed to allege enough specific facts plausibly suggesting actual knowledge, Plaintiffs in the present

24  case have alleged specific facts and details that satisfy the plausibility test of *Twombly* and *Iqbal*.

25      This conclusion is supported by the Ninth Circuit's recent decision in *Al-Kidd v. Ashcroft*,

26  580 F.3d 949 (9th Cir. 2009).  Applying the standard articulated in *Twombly* and *Iqbal*, the court

27  admonished that "'[t]he plausibility standard is not akin to a 'probability requirement' but it asks for

28  more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* at 976 (quoting *Iqbal*, 129

United States District Court

For the Northern District of California

1   S. Ct. at 1949).  The court added that at the pleading stage, "[a]sking for plausible grounds to infer

2   the existence of a claim for relief . . . simply calls for enough facts to raise a reasonable expectation

3   that discovery will reveal evidence to prove that claim." *Id.* at 977 (quoting *Twombly*, 550 U.S. at

4   556) (internal quotation marks omitted).  In light of the cumulative effect of numerous allegations,

5   the court ultimately concluded that the complaint plausibly suggested a claim for relief. *See id.* at

6   976. *Al-Kidd* teaches that a court must consider the sum of the allegations pled in a complaint.  In

7   the cases at bar, the sum of the allegations, together with reasonable inferences therefrom, establish

8   a sufficiently plausible claim of aiding and abetting for pleading purposes.

9   C.   Conspiracy

10       In the alternative, the *Benson* plaintiffs allege that JPMorgan is liable for civil conspiracy.  In

11  California, liability for civil conspiracy depends on proof of the following elements: (1) the

12  formation and operation of a conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and

13  (3) damages arising from the wrongful conduct. *See Kidron v. Movie Acquisition Corp.*, 40 Cal.

14  App. 4th 1571, 1581 (Cal. Ct. App. 1995).  The thrust of JPMorgan's argument is that the *Benson*

15  plaintiffs failed to allege facts establishing the formation of a conspiracy – *i.e.*, the complaint lacks

16  factual allegations showing an agreement between WaMu/JPMorgan and other conspirators to

17  defraud the *Benson* plaintiffs. *See* Benson Mot. at 9-10.  According to JPMorgan, the conspiracy

18  claim fails because the *Benson* plaintiffs only provide a bare, conclusory allegation of an agreement,

19  which is insufficient under *Twombly*. *See id.*  The Court notes that, while there may have been a

20  financial incentive for WaMu/JPMorgan to aid and abet Mr. Wise and associates given the

21  importance of their accounts to the Napa branch, there is no obvious incentive to enter a conspiracy

22  agreement.

23       In any event, at the hearing, the *Benson* plaintiffs acknowledged these deficiencies and

24  conceded without argument that their conspiracy claim, as it presently stands, fails to satisfy

25  *Twombly*'s plausibility standard.  Accordingly, the Court grants Defendant's motion to dismiss with

26  respect to the conspiracy claim but gives the *Benson* plaintiffs leave to amend.

27  D.   Section 17200 Claim

28

United States District Court

For the Northern District of California

1     Plaintiffs also allege that WaMu/JPMorgan's conduct as aider and abetter violates the UCL.

2  In response, JPMorgan argues that the UCL does not cover Plaintiffs' claims because the UCL does

3  not apply to securities transactions. *See Benson Mot. at 11-12; Lowell Mot. at 9-10.* However, the

4  scope of the UCL is not well settled, and relevant state cases indicate that the courts are divided on

5  whether the UCL applies to securities transactions.

6     JPMorgan relies on one line of authorities which have limited the scope of the UCL to claims

7  that would normally be covered by the Federal Trade Commission ("FTC") Act, 15 U.S.C. §§ 45 *et*

8  *seq. See Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777 (Cal. Ct. App. 2004);

9  *Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061 TEH, 2005 U.S. Dist. LEXIS 20221

10  (N.D. Cal. Aug. 25, 2005) (following *Bowen*). In *Bowen*, plaintiff investors brought a UCL claim

11  against a publicly traded Nevada corporation, alleging that several individuals, acting as the

12  corporation's agents, defrauded investors by soliciting stock investments but failing to disclose

13  material facts about the investments. *See Bowen*, 116 Cal. App. 4th at 779-81. Faced with the issue

14  of whether the UCL applied to "securities transactions," the *Bowen* court considered the UCL as the

15  state counterpart to the FTC Act and held that such transactions were not covered. *See id.* at 788. In

16  so holding, the court was guided by several factors, including the fact that, historically, the FTC has

17  declined to view the FTC Act as reaching securities transactions, as well as the fact that many other

18  jurisdictions had previously declined to extend the reach of their state consumer protection statutes

19  to cover securities transactions. *See id.* at 786-87. Most notably, *Bowen* relied on *Spinner Corp. v.*

20  *Princeville Dev. Corp.*, 849 F.2d 388 (9th Cir. 1988),[2] a Ninth Circuit decision that interpreted the

21  reach of Hawaii's "little FTC Act" with respect to securities transactions. *See Bowen*, 116 Cal. App.

22  4th at 788. *Bowen* found *Spinner* to be of particular import for several reasons: (1) the California

23

24     [2] *Spinner* involved a case where a defendant privileged to confidential information concerning
two corporations involved in a hostile tender offer (Spinner and Princeville) improperly disclosed
25  confidential information concerning Princeville to Spinner. *See Spinner*, 849 F.2d at 389. Princeville
argued that the disclosure violated Hawaii's "baby FTC Act," but the *Spinner* court held that the Hawaii
26  law did not cover the conduct at issue. *See Spinner*, 849 F.2d at 393. The court reached its conclusion
for several reasons, including, *inter alia*, the fact that the Hawaii legislature instructed courts to construe
27  the state statute in accordance with jurisprudence regarding similar federal antitrust statutes, namely
§ 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and the fact that other Hawaii statutes covered the acts
28  complained of by the plaintiff. *See id.* at 389-93.

**United States District Court**

For the Northern District of California

1  and Hawaii statutes were nearly identical; (2) in enacting the UCL, the California legislature did not

2  indicate whether it intended to diverge from the intent of the Hawaii legislature in enacting the

3  Hawaii statute, *i.e.*, protecting consumers from unethical business practices that resulted in relatively

4  small commercial injuries; and (3) prior California cases had held that California courts could turn to

5  jurisprudence arising under § 5 of the FTC Act for guidance on the UCL. *See id.* at 788-89.  Based

6  on the fact that the FTC Act had never been applied to securities transactions, and the fact that other

7  jurisdictions had held that their "little FTC Acts" did not apply to securities transactions, *Bowen* also

8  concluded that the UCL did not apply to securities transactions. *See id.* at 790.

9       On the other hand, Plaintiffs rely on another line of authorities which have rejected *Bowen*'s

10  narrow reading of the UCL in favor of a more generous interpretation of the statute.  *See Roskind v.*

11  *Morgan Stanley Dean Witter & Co.*, 80 Cal. App. 4th 345 (Cal. Ct. App. 2000); *Overstock.com, Inc.*

12  *v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (Cal. Ct. App. 2007).  Unlike *Bowen*, these cases

13  have considered the UCL to be more than just a mirror of the FTC Act.  Rather than limiting the

14  scope of the UCL to that of the FTC Act, these cases assume that the UCL was intended to apply

15  wherever wrongful business practices may occur.  *See Roskind*, 80 Cal. App. 4th at 351; *Overstock*,

16  151 Cal. App. 4th at 716.  For instance, in *Roskind*, plaintiff stockholders sued a brokerage firm for

17  "trading ahead," alleging that the firm's conduct violated the UCL.  *See Roskind*, 80 Cal. App. 4th at

18  348.  Although the precise issue facing the *Roskind* court concerned whether federal law preempted

19  the UCL, the court also explored whether the UCL could apply and provide a remedy for the

20  conduct alleged, *i.e.*, "trading ahead." *See id.* at 350-51.  In determining the scope of the statute, the

21  court was guided by prior decisions of California courts, including *American Philatelic Society v.*

22  *Claibourne*, which held:

> [T]he Legislature ... intended by this sweeping language to permit
> tribunals to enjoin on-going wrongful business conduct in whatever
> context such activity might occur.  Indeed, . . . the section was
> intentionally framed in its broad, sweeping language, precisely to
> enable judicial tribunals to deal with the innumerable new schemes
> with the fertility of man's invention would contrive.

27  *Id.* (quoting *American Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689, 698 (Cal. 1953)) (internal

28  quotation marks omitted).  Based on the court's review of past decisions reflecting a broad reading

United States District Court

For the Northern District of California

of the UCL, the court concluded that, absent preemption, the UCL potentially could provide a remedy for the "trading ahead." *See id.* at 350-51.  Unlike *Bowen*, the *Roskind* court declined to follow *Spinner*, because the UCL, unlike the Hawaii law, has "always been given a broad and sweeping ambit by our Legislature and our Supreme Court," and "[t]he UCL contains no language supporting an exclusion for securities."  *Id.* at 356 n.8.

Similarly, the *Overstock* court also declined to limit the scope of the UCL to the scope of the FTC Act.  *See Overstock*, 151 Cal. App. 4th at 715-16.  In *Overstock*, a publicly traded company ("Overstock") sued the defendant for allegedly causing Overstock's share prices to drop after the defendant prepared and distributed defamatory analytic reports to investors.  *See id.* at 697-98.  One of the issues the court addressed was *Bowen*'s exemption of securities transactions from the UCL.  *See id.* at 714-15.  Unlike *Bowen*, the *Overstock* court did not find *Spinner* to be instructive because the UCL, as compared to the Hawaii statute, contained no directive to interpret the UCL in accordance with the FTC Act.  *See id.* at 715.  Instead of adopting the position taken by *Bowen,* the *Overstock* court echoed *Roskind*, noting that the UCL's broad and sweeping language reflected an intent to adjudicate "on-going wrongful business conduct in whatever context such activity might occur."  *Id.* at 716 (quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 181 (Cal. 1999)) (internal quotation marks omitted).  Ultimately, the court limited *Bowen*'s reach by asserting that *Bowen*'s holding excluding securities transactions from coverage of the UCL only "bars lawsuits based on deceptive conduct in the sale and purchase of securities, nothing more."  *Id.* at 715.  Since Overstock's claims "[*did*] *not arise from any stock transactions between the parties*" but instead, arose from the defendant's production of allegedly defamatory reports, the court held that *Bowen* did not bar the claim.  *Id.* at 715.

In sum, *Roskind* and *Overstock* hold that the UCL should apply to a broad array of contexts, including securities, and is not merely confined to what would normally be covered by the FTC Act only.  Only actual securities transactions are excluded.

The Court notes that *Overstock* currently constitutes the most recent authority on the issue. Further, the Court finds the *Roskind* and *Overstock* courts' analysis of the UCL persuasive.  As the *Roskind* court aptly noted, prior decisions have consistently held that the UCL should be broadly

United States District Court

For the Northern District of California

1    interpreted and applied, "given the creative nature of the scheming mind," as well as the

2    impossibility in drafting "in advance detailed plans and specifications of all acts and conduct to be

3    prohibited . . . , since unfair or fraudulent business practices may run the gamut of human ingenuity

4    and chicanery." *Roskind*, 80 Cal. App. 4th at 351 (citing *Cel-Tech*, 20 Cal. 4th at 181) (internal

5    quotation marks omitted).

6            Moreover, federal cases are consistent with *Overstock*. *See, e.g.*, *Strigliabotti v. Franklin

7    Resources, Inc.*, No. C 04-00883 SI, 2005 U.S. Dist. LEXIS 9625, at *30 (N.D. Cal. Mar. 7, 2005)

8    (rejecting a broad reading of *Bowen* and allowing plaintiff shareholders to bring an UCL action

9    against investment advisors who allegedly charged excessive fees for advisory and administrative

10   services, as well as excessive fees for marketing, selling, and distributing mutual fund shares); *In re

11   Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009) (limiting the reach of

12   *Bowen* and allowing plaintiff investors to bring an UCL action where investment firm allegedly

13   deviated from investment policies without obtaining proper vote, a violation of Section 13(a) of the

14   Investment Company Act, 15 U.S.C. § 80a-13).

15           To be sure, the facts of this case arguably fall closer to *Bowen* than those in *Overstock* and

16   *Roskind*. Had this suit been brought against Mr. Wise and his associates for fraud, *Bowen* would

17   apply since the sale of fraudulent CDs would constitute a securities transaction.  Here, the suit is

18   against the bank for aiding and abetting the sale.  Although more closely related to the sale of

19   securities than the contested conduct in *Overstock* and *Roskind*, WaMu/JPMorgan is not being sued

20   for the sale of securities.  Thus, the claim thus falls outside the literal confines of *Bowen*.

21           The Court's conclusion is bolstered by the fact that federal securities law does not provide a

22   private right of action against aiders and abettors under Section 10(b) of the Securities Exchange Act

23   of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See Cent. Bank, N.A. v. First

24   Interstate Bank, N.A.*, 511 U.S. 164, 191 (1994); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,

25   Inc.*, 552 U.S. 148, 158 (2008) ("The § 10(b) implied private right of action does not extend to aiders

26   and abettors.").  Thus, the UCL, interpreted to allow the claim herein, would not duplicate an

27   available remedy under federal securities laws.  Although the Supreme Court in so holding relied on

28   both the statutory language and policy concerns in holding no such remedy obtained under federal

securities law, there is no indication that Congress intended to preempt the states from providing remedies for aiding and abetting fraudulent securities transactions.

Finally, to the extent that JPMorgan also argues that Plaintiffs failed to allege facts to support their UCL claims, this argument also fails.  The UCL claims are predicated on WaMu/JPMorgan's role as aider and abettor, and the Court previously found that Plaintiffs adequately pleaded the aiding and abetting causes of action.  Altogether, the Court finds that Plaintiffs' UCL claims are sufficiently pleaded.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  More specifically, the motion to dismiss is granted with respect to the conspiracy claim but denied with respect to the aiding and abetting and UCL claims.  The Court grants the *Benson* plaintiffs leave to amend their conspiracy claim by May 12, 2010.

This order disposes of Docket No. 12 in the *Benson* case and Docket No. 14 in the *Lowell* case.


IT IS SO ORDERED.


Dated:  April 15, 2010

_____
EDWARD M. CHEN
United States Magistrate Judge

**United States District Court**
For the Northern District of California

14